UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
Hamza Attawwab, pro se,

               Petitioner,       **MEMORANDUM AND ORDER**

               -against-             04-CV-3889 (DLI)

Roy A. Gurdich, Superintendent,
Upstate Correctional Facility,

               Respondent.
------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

      On September 14, 2000, Hamza Attawwab ("Petitioner" or "Attawwab") was convicted in New York State Supreme Court, Kings County, after a trial by jury, of two counts of murder in the second degree and of criminal possession of a weapon in the second degree. The trial court sentenced petitioner to concurrent prison terms of twenty-five years to life for each of the murders and to fifteen years for the weapon possession. The Appellate Division, Second Department, affirmed petitioner's conviction on April 14, 2003. *People v. Attawab*, 304 A.D.2d 672, 757 N.Y.S.2d 485 (2d Dep't 2003). The New York Court of Appeals denied petitioner's application for leave to appeal on July 17, 2003. *People v. Attawwab*, 100 N.Y.2d 578, 764 N.Y.S.2d 388 (2003). On May 7, 2003, while petitioner's application for leave to appeal to the Court of Appeals was pending, petitioner made a motion *pro se* for a writ of error *coram nobis* in the Appellate Division claiming ineffective assistance of appellate counsel. On August 18, 2003, the Appellate Division denied petitioner's *coram nobis* application. *People v. Attawwab,* 307 A.D.2d 1000, 763 N.Y.S.2d 496 (2d Dep't 2003). Petitioner did not apply for leave to appeal the denial of his *coram nobis*

1

motion to the Court of Appeals.

Petitioner challenges his conviction through the instant petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on the grounds that (1) petitioner's right against self-incrimination was violated because his videotaped statement was coerced, and (2) the trial court's preclusion of petitioner's medical records from evidence denied petitioner a fair trial. For the reasons set forth below, the petition is denied.

**I.     Facts**

On February 16, 1999, at approximately 5:00 a.m., petitioner served as a lookout while two unapprehended others shot and killed Clifford Josephs and Alan Howard in the lobby of 351 Howard Avenue in Brooklyn. On February 27, 1999, a detective with the 73rd Precinct, Detective Ferro, asked Officer Cocco, a police officer with the 73rd Precinct, to bring petitioner into the police station. (R. at 78-79.)[1] Around 8:00 p.m., Officer Cocco returned with petitioner and placed him in the Robbery Apprehension Module Office, a windowless room of ten to twelve by fifteen feet, with a one-way mirror on one wall. (*Id*. at 108-09, 111, 132-33.)

At 11:10 p.m., without telling petitioner that he was under arrest, Detective Ferro and another detective, Detective Bazatta, explained that they were investigating a murder that had occurred on February 16, 1999, at 351 Howard Street, and wanted to talk to him because they believed he had been in the area at the time of the shooting. (*Id*. at 109-12, 125.) Detective Ferro then read petitioner the *Miranda* warnings. (*Id*. 112-13.) At 11:23 p.m., petitioner waived his *Miranda* rights and gave a statement that he was at his grandmother's house in Allentown, Pennsylvania from February 12, 1999 through February 26, 1999. (*Id*. at 113-15, 152.) The detectives wrote down petitioner's

---

[1]Page references proceeded by "R." refer to the minutes of the trial.

statement, and after reading it back to him, petitioner told the detectives that he did not want to talk anymore. (*Id*. at 117, 142.)

Nevertheless, around 2:00 a.m. on February 28, 1999, Officer Cocco questioned petitioner for about three to five minutes, without knowing that he had invoked his *Miranda* rights. (*Id.* at 83, 87-88.) Specifically, Officer Cocco asked petitioner if the story he told the detectives was truthful. Petitioner responded, "no, not really." (*Id*. at 237.) Officer Cocco then asked petitioner to explain what happened on February 16, 1999. (*Id*.) Petitioner stated that he stood on the corner during the incident serving as a look-out. (*Id*.) When asked what he meant by lookout, petitioner said "I was supposed to go like 'woop-woop' to let them know that the cops were coming." (*Id*. at 225, 238.) Officer Cocco then asked petitioner if he would be willing to tell the two detectives what he had just said. Petitioner said that he would. (*Id*. at 238.) Officer Cocco testified that he did not use any "force" to change petitioner's mind about speaking with the detectives and that he did not notice any physical injuries on petitioner at that time. (*Id.* at 89.)

Shortly after 2:00 a.m., Detective Ferro and Detective Bazatta rejoined Officer Cocco and petitioner in the interviewing room and, without administering new *Miranda* warnings, obtained an oral and a written statement from petitioner. (*Id*. at 238.) Detective Ferro denied that upon reentering the interrogation room, petitioner started to cry and said that Officer Cocco had hit him. (*Id*. at 134.) Rather, Detective Ferro testified that no one hit petitioner through his coat, nor did anyone hit him at all while he was in police custody. (*Id*. at 140-41.) Officer Cocco further testified that he never told petitioner to say that he had been the lookout, nor to implicate Michael Cunningham ("Cunningham") and Chris "Iceberg" Tirado ("Tirado") so that he could testify as a witness against them. (*Id*. 252-53.)

3

In relevant part, petitioner's statement was that at 3:00 a.m. on February 16, 1999, he was at 2065 Dean Street with Cunningham, Tirado and others. Cunningham decided to kill Clifford Josephs to make 2065 Dean Street "his spot," and told petitioner to see who was around outside. Petitioner checked for police and was to say "woop-woop" if he saw any. Cunningham and Tirado took the victims, Clifford Josephs and Alan Howard, inside. Five minutes later, petitioner heard a gun shot and saw Cunningham run out. A few seconds later, petitioner heard another shot and saw Tirado run out. Petitioner fled with them into an apartment at 2065 Dean Street where both Cunningham and Tirado admitted killing one of the victims. Cunningham told petitioner to keep the gun in his apartment, but petitioner's sister would not allow him to bring it in the apartment. Instead, petitioner went to Tirado's apartment where Tirado wiped off the gun, removed the clip and placed it under his mattress. Afterwards, petitioner returned to the apartment at 2065 Dean Street, where he stayed until 7:00 a.m., and then went home. (*Id*. at 223-26.)

The written statement covered four and one-half to five pages, and after reading the statement back to petitioner, Detective Ferro, Detective Bazatta and petitioner each signed the statement. (*Id*. at 144-48, 153, 222-23.) Detective Ferro then typed the statement on a DD-5 report and petitioner read and signed the DD-5. (*Id*. at 223.) Officer Cocco testified that he brought food to petitioner following the interview, and that he neither injured petitioner nor did petitioner appear to have any injuries at that time. (*Id*. at 89.)

Over twenty hours later, at 10:30 p.m. on February 28, 1999, petitioner gave a videotaped statement to Assistant District Attorney Stan Irvin ("A.D.A. Irvin") that was later introduced at trial. Petitioner's videotaped statement was consistent with the second set of statements he had given to Detective Ferro and Detective Bazatta. (*Id*. at 75.) Before proceeding, A.D.A. Irvin read petitioner

4

the *Miranda* warnings from a printed sheet of paper and petitioner verbally waived his rights. Petitioner then asked A.D.A. Irvin what the charges were against him and about being a witness. A.D.A. Irvin clarified that no charges had been brought against petitioner yet, and that no promises were being made to him in exchange for his statement. (*Id*. at 34-35.) While giving the statement, petitioner twice asked the detectives the building numbers of certain buildings. A.D.A. Irvin responded, "Has anyone told you what to say? Has anyone told you we want you to say this or is this what you're telling me happened?" Petitioner answered, "Nah." Later in the statement, petitioner denied that anyone had forced him to give the statement. At trial, A.D.A. Irvin testified that, if petitioner had complained about mistreatment from Detective Ferro during the videotaped statement, he would have had another officer replace Detective Ferro in the room so that petitioner could speak freely. (*Id*. at 33.) Following the making of the videotaped statement, petitioner was arrested and charged with two counts of murder in the second degree (P.L. § 125.25[3]), criminal possession of a weapon in the second degree (P.L. § 265.03[2]), and criminal possession of a weapon in the third degree (P.L. § 265.02[4]). Throughout the time petitioner was at the station house, he was allowed to eat, drink and use the restroom. (*Id*. at 122.)

Petitioner was brought to Central Booking on the morning of March 1, 2006. (*Id*. at 397.) Soon thereafter, petitioner complained that the detectives had coerced him into confessing by assaulting and threatening him. An officer referred petitioner to the Internal Affairs Bureau after seeing a bump on the back of his head. (*Id*. at 398-99.) After interviewing petitioner about his assault claim, the Internal Affairs Bureau took petitioner to the hospital where his bump and other complaints were noted. X-rays and CAT scans were performed, and he was given instructions for treatment of a head injury, sprain and bruises. (Def.'s Appellate Brief at 4.)

5

At a suppression hearing held before trial, the trial court granted petitioner's motion to suppress the statements made to Officer Cocco, Detective Ferro and Detective Bazatta after 2:00 a.m. because Officer Cocco failed to honor petitioner's earlier request not to speak anymore. (Suppression Hr'g Tr., Aug. 28, 2000, at 12.) However, the trial court denied petitioner's motion to suppress the videotaped statement because petitioner validly waived his *Miranda* rights to the assistant district attorney. (Suppression Hr'g Tr., June 5, 2000, at 2.) The primary issue at trial then became the voluntariness of petitioner's videotaped statement. (*Id*. at 395, 401.)

The prosecution anticipated that petitioner would seek to introduce his medical records on the issue and argued that no foundation had been laid because all of the police witnesses had denied that petitioner was physically abused while in their custody and because the government could not challenge the statement in the records that petitioner had not been beaten by the police. (*Id*. at 388-89.) In response, petitioner argued that the statement about the police beating him could be redacted, but that the records should be admitted because he was in police custody when he was taken to the hospital. (*Id*. at 389.) Petitioner further argued that the records were admissible to impeach the officers' testimony that there were no injuries. (*Id*. at 394, 400.) The trial court denied admission of the medical records on the following grounds: (1) the records were irrelevant because petitioner's complaint about his injuries was not made until after he left the precinct; (2) no evidence showed that the officers were responsible for the injuries; (3) petitioner's statement in the records that he was beaten by the police was self-serving and was not necessary for treatment; and (4) the records would cause the jury to speculate as to when, where and how petitioner was injured. (*Id*. at 399-402.)

On September 14, 2000, petitioner was found guilty of two counts of murder in the second degree (P.L. § 125.25[3]) and criminal possession of a weapon in the second degree (P.L. §

265.03[2]). On October 5, 2000, petitioner was sentenced to concurrent prison terms of twenty-five years to life for each of the murders and to fifteen years for the weapon possession. (Sentencing Hr'g Tr. at 12.) For an outstanding charge of first degree robbery unrelated to this case, the court sentenced petitioner to a prison term of twelve and one-half to twenty-five years of imprisonment to run concurrently to the sentences imposed in this case. (*Id*.)

*Procedural History*

Petitioner appealed from his judgment of conviction to the New York State Supreme Court, Appellate Division, on two grounds: (1) that the trial court violated his right to present a defense and to confront witnesses when it precluded introduction of his medical records into evidence that allegedly would have shown that his confession was physically coerced; and (2) that the sentence was harsh and excessive. The Appellate Division affirmed the judgment of conviction on April 14, 2003, holding that petitioner "failed to lay a proper foundation for the admission of either a redacted version of his medical records or the entire file" and that the sentence "was not excessive." *Attawwab,* 304 A.D.2d at 757. The Court of Appeals denied petitioner's application for leave to further appeal his criminal conviction. *Attawwab,* 100 N.Y.2d at 578.

On May 7, 2003, while his application for leave to appeal to the Court of Appeals was pending, petitioner moved *pro se* in the Appellate Division for a writ of error *coram nobis*. Petitioner claimed ineffective assistance of appellate counsel because counsel failed to raise two claims: (1) that the videotaped statement should have been suppressed because it was not attenuated from the taint of an earlier *Miranda* violation and because the statement itself was coerced; and (2) that trial counsel rendered ineffective assistance by failing to lay a proper foundation for admission of the medical records and by introducing into evidence petitioner's earlier statements, which had

7

been suppressed. Petitioner's appellate counsel, Erica Horowitz, responded to the motion by affirmation dated June 3, 2003, explaining that the claim regarding suppression of the videotaped statement was not raised because the twenty-four hour break between the videotaped statement and a previous statement was far longer than the time periods under which courts have held statements to be attenuated, and the claim regarding ineffective assistance of trial counsel was not raised because trial counsel had sound strategic reasons for admitting the suppressed statements and a proper foundation had been laid for admission of medical records. On August 18, 2003, the Appellate Division denied petitioner's *coram nobis* motion holding that petitioner did not receive ineffective assistance of appellate counsel. *Attawwab*, 307 A.D.2d at 1000. Petitioner did not apply for leave to appeal the denial of his *coram nobis* motion to the Court of Appeals.

## II. Discussion

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), where claims in state court were "adjudicated on the merits," the federal district court may grant a petition for a writ of habeas corpus only upon a finding that the state court proceeding

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."

*Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). Habeas relief is available under the "unreasonable determination" clause "if the state court identifies the correct governing principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the state court's application must have been "objectively unreasonable." *Id.* at 409. In reviewing the state court decision, "a determination of a factual issue made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**B. Petitioner's Fifth Amendment Claim is Unexhausted and, in any event, Meritless**

Petitioner contends that his Fifth Amendment privilege against self-incrimination was violated because his confession was involuntary and induced by police coercion. The court first examines respondent's argument that petitioner did not exhaust his state law remedies because he failed to raise his claim of involuntary statements on appeal. "Prior to bringing a petition for habeas corpus pursuant to 28 U.S.C. § 2254, petitioner must exhaust the remedies available in state court or demonstrate that 'there is an absence of available State corrective processes [or] [that] circumstances exist that render such processes ineffective to protect the rights of the applicant.'" *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 808 (2d Cir. 2000) (*quoting* 28 U.S.C. § 2254(b)(1)) (alterations in original). The exhaustion requirement is not satisfied unless the federal claim has been "fairly presented." *Galdamez v. Keane,* 394 F.3d 68, 73 (2d Cir. 2005). A claim has been

9

"fairly presented" if the "state courts [have had] one full opportunity to resolve any constitutional issues by invoking one complete round of the [s]tate's established appellate review process. A complete round requires that the petitioner present his claim to the highest court of the state." *Id.*

Petitioner claims that he exhausted his involuntary statements claim when he raised it in his *coram nobis* motion. ( Pet.'s Reply Mem. at 6.) However, in the *error nobis* motion, petitioner's involuntary statements claim was subsumed within a broader claim of ineffective assistance of appellate counsel. A claim raised within a broader ineffective assistance of counsel claim fails to exhaust the underlying claim because a court's "rejection of the ineffective assistance claim without detailed comment does not bespeak any necessary ruling on the underlying constitutional claim." *Turner v. Artuz,* 262 F.3d 118, 123 (2d Cir. 2001), *cert. denied,* 534 U.S. 1031 (2001). The court considering ineffective assistance might not have reached the underlying constitutional claim. *Id*. Here, the Appellate Division ruled that "[t]he appellant has failed to establish that he was denied effective assistance of appellate counsel," without speaking to the merits of the underlying claims. *Attawwab,* 307 A.D.2d at 1000. Moreover, petitioner failed to seek leave to appeal the denial of his *coram nobis* motion to the Court of Appeals. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 839-40, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999) (holding that a state prisoner must present his claim to the highest state court that has jurisdiction even if that court has only discretionary review). Accordingly, the New York State Court of Appeals did not have a "fair opportunity" to consider petitioner's involuntary statements claim. *See Galdamez,* 394 F.3d at 73.

The exhaustion problem may be addressed in one of three ways: (1) outright dismissal of the petition without prejudice, pursuant to *Rose v. Lundy,* 455 U.S. 509, 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982); (2) stay of the petition for a reasonable amount of time to enable petitioner to present

his claims to the state courts and to return to federal court after exhaustion, pursuant to *Zarvela v. Artuz,* 254 F.3d 374 (2d Cir. 2001); or (3) outright denial of the petition based on the absence of any merit, pursuant to 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). With respect to staying the petition to allow petitioner to exhaust his state remedies, the Supreme Court has cautioned:

> [S]tay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless.

*Rhines v. Weber*, 544 U.S. 269, 277, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005).

Although petitioner's involuntary statements claim is unexhausted, and no doubt procedurally defaulted, it is also meritless. The police may use a defendant's confession without violating his Fifth Amendment right when the decision to confess is the defendant's free choice. *United States v. Anderson,* 929 F.2d 96, 98 (2d Cir. 1991). In determining coerciveness, courts examine the totality of the circumstances of the interrogation, including the accused's characteristics, the conditions of the interrogation and the conduct of the police. *Parsad v. Greiner,* 337 F.3d 175, 183 (2d Cir. 2003) (citation omitted). Although *Miranda* requires suppression of an unwarned admission, a pre-*Miranda* custodial interrogation does not necessarily require that subsequent, post-*Miranda* statements be suppressed. *See Oregon v. Elstad,* 470 U.S. 298, 318, 105 S. Ct. 1285, 84

11

L. Ed. 2d 222 (1985).² In *Elstad,* officers arrested the defendant at his home pursuant to an arrest warrant, and briefly questioned him without advising him of his rights, obtaining the defendant's admission that he was present at the burglary with which he was charged. The defendant was taken to the sheriff's office, where, approximately an hour later, he was advised of his rights, agreed to speak to the officers, and made a full confession. 470 U.S. at 300-01. Noting that the "task of defining 'custody' is a slippery one," and that consequently "'policemen investigating serious crimes [cannot realistically be expected to] make no errors whatsoever,'" the Supreme Court ruled that "a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will" does not "so taint[ ] the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Id*. at 309 (*quoting Michigan v. Taylor,* 417 U.S. 433, 446, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974)). In so deciding, the "Supreme Court expressly rejected the 'cat out of the bag theory' under which, once an incriminating statement has been made, no subsequent confession can be truly voluntary." *Nova v. Bartlett,* 211 F.3d 705, 708 (2d Cir 2000) (citing *Elstad*, 470 U.S. at 318).

The facts of the present case show that petitioner's videotaped confession was voluntary.

---

² The extent to which *Missouri v. Siebert* limits the holding in *Elstad* is irrelevant here because *Siebert* was handed down after the Appellate Division's decision on August 18, 2003. 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004) (holding that the technique of intentionally withholding *Miranda* rights to obtain a confession, only to subsequently read the *Miranda* rights and continue the interrogation, was unconstitutional). Therefore, the Appellate Division's decision was not contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1) (habeas relief available only if state court decision was contrary to, or involved an unreasonable application of, "clearly established Federal law as determined by the Supreme Court"); *Williams,* 529 U.S. at 412 ("clearly established" federal law refers to Supreme Court holdings as of the time of the relevant state-court decision).

Unlike the pre-*Miranda* custodial interrogation in *Elstad*, Detective Ferro gave petitioner the *Miranda* warnings at 11:00 p.m. on February 27, 1999, three hours after he was taken into custody. Petitioner initially waived his *Miranda* rights by providing the false alibi that he had been in Allentown, Pennsylvania at the time of the shooting. When Detective Ferro asked petitioner if he wanted to stay with the statement, petitioner replied that he no longer wanted to speak. Nevertheless, without knowing that petitioner did not want to speak anymore, Officer Cocco began questioning petitioner at 2:00 a.m., thereby unintentionally breaching petitioner's invocation of his *Miranda* rights. Shortly after 2:00 a.m., petitioner gave both an oral and written statement confessing that he had served as a look-out during the shootings of Clifford Josephs and Alan Howard. Petitioner then signed the written statement, as well as the DD-5 report that Detective Ferro typed to reflect the written statement.

Thereafter, merely twenty-four hours later, at 10:30 p.m. on February 28, 1999, petitioner gave a videotaped statement to a prosecutor. The videotaped statement was not made as part of a virtually continuous sequence of questioning at the same location, but at a different location, after a considerable lapse of time. Indeed, the more than twenty-hour separation between the two statements here was significantly greater than the one hour separation which existed in *Elstad*. Moreover, before proceeding with the second interrogation, A.D.A. Irvin read petitioner the *Miranda* warnings from a printed sheet of paper and petitioner demonstrated that he understood his rights. After petitioner waived his *Miranda* rights, petitioner asked about being a witness and about the charges that could be brought against him. A.D.A. Irvin also made clear that no promises were being made to petitioner in exchange for his statement and that no charges had been brought against him yet. During the statement, A.D.A. Irvin twice asked petitioner if "anyone [had] told [him] what to

say." Both times, petitioner answered, "Nah." Later in the statement, petitioner denied that anyone had forced him to give the statement. At trial, both Officer Cocco and Detective Ferro repeatedly testified that they never employed physically abusive tactics in obtaining petitioner's statements. Petitioner was also allowed to eat, drink and use the restroom during his time at the station house. Accordingly, petitioner's confession did not violate his Fifth Amendment right to self-incrimination.[3]

### C. The Trial Court Did Not Err in Precluding Petitioner's Medical Records

Petitioner next claims that he was denied a fair trial because the trial court violated his right to present evidence to rebut the voluntariness of his confession by precluding his medical records from evidence. The medical records contained petitioner's statement that he "was beaten up by the cops," as well as the injuries and their treatment. Petitioner first raised this argument on appeal. The Appellate Division affirmed the trial court's preclusion of petitioner's medical records because petitioner "failed to lay a proper foundation for the admission of either a redacted version of his medical records or the entire file." *Attawwab,* 304 A.D.2d at 672. Respondent contends that petitioner is not entitled to habeas corpus relief because the Appellate Division's conclusion was neither contrary to, nor involved an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). Alternatively, respondent argues that if the preclusion of

---

[3]In the petition for a writ of habeas corpus, petitioner claims that his Sixth Amendment right to effective assistance of counsel was violated by his appellate counsel's failure to raise the involuntary statements claim. Under *Strickland v. Washington,* a petitioner must show that counsel's representation "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Petitioner's claim fails because, even assuming appellate counsel's performance was constitutionally deficient, petitioner has failed to "affirmatively prove prejudice." *Id*. at 693-94. Here, Officer Cocco's unintentional breach of petitioner's invocation of his *Miranda* rights at 2:00 a.m. did not warrant suppression of the subsequent, post-*Miranda* videotaped statement given over twenty hours later at 10:30 p.m. *See Elstad,* 470 U.S. at 318.

14

petitioner's medical records was error, the error was harmless. The court agrees.

Due process requires that criminal defendants be afforded a meaningful opportunity to present a complete defense, that is, to present to the jury admissible evidence that might influence the determination of guilt. *See Grotto v. Herbert,* 316 F.3d 198, 205-06 (2d Cir. 2003) (citing *Taylor v. Illinois,* 484 U.S. 400, 409, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)). Nonetheless, the defendant must comply with established rules of evidence designed to assure both fairness and reliability. *See United States v. Edwards,* 631 F.2d 1049, 1051 (2d Cir. 1980); *see also Taylor,* 484 U.S. at 410 ("[t]he accused does not have an unfettered right to offer testimony that is . . . inadmissible under standard rules of evidence."). Trial judges retain broad discretion to exclude evidence that is irrelevant, s*ee Washington v. Shriver,* 255 F.3d 45, 56 (2d Cir. 2001), and are accorded wide latitude in weighing the many unique and incalculable factors that figure into that decision. *See Hamling v. United States,* 418 U.S. 87, 124-25, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). For instance, a trial judge may decide to exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Fed. R. Evid. 403; *Montana v. Egelhoff,* 518 U.S. 37, 42, 116 S.Ct. 2013, 135 L.Ed.2d. 361 (1996). Furthermore, in the habeas corpus context, relief cannot be granted unless the "omitted evidence creates a reasonable doubt that did not otherwise exist." *Justice v. Hoke,* 90 F.3d 43, 47 (2d Cir. 1996) (citing *United States v. Agurs,* 427 U.S. 97, 112-13, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976)).

In the instant case, the Appellate Division's affirmance of the trial court's ruling on the admissibility of petitioner's medical records did not constitute either a deviation from, or an unreasonable application of, the above principles. First, petitioner's self-serving statement in the medical records that he "was beaten up by the cops" was clearly not admissible because it was not

made for purposes of diagnosis and treatment. Fed. R. Evid. 803(4); 5 Jack B. Weinstein & Margaret A. Berger, WEINSTEIN'S EVIDENCE ¶ 803(6) [1] 2006 (noting that although medical records are admissible under Rule 803(6) as an exception to the hearsay rule, statements made to medical professionals may only be admitted if they were recorded for purposes of diagnosis and treatment).

Second, the trial judge properly exercised his discretion in finding that the injuries and treatment portions of the medical records lacked relevancy because petitioner failed to lay a foundation for admission by linking the injuries to the alleged beating by the police. At trial, both Detective Ferro and Officer Cocco denied using physical violence against petitioner during the interrogation and Officer Cocco denied ever seeing any physical injuries on petitioner. Detective Ferro further denied that upon reentering the interrogation room, petitioner began to cry and said that Officer Cocco had hit him. Without evidence, either through the officers' testimony or through petitioner's own testimony, that the officers had harmed him, petitioner could not link the medical records to any alleged police violence against him.

Lastly, the trial judge properly found that the potential for the medical records to mislead the jury outweighed their probative value. The probative value of the medical records was minimal at best because, with the exception of petitioner's self-serving statement that he had been "beaten up by the cops," nothing in the records indicated that petitioner's injuries could only have occurred in the thirty-seven hour period between when petitioner was taken into custody and when he first complained about his injuries. According to the medical records, petitioner's injuries consisted of a bump on the head and bruising. However, the medical records do not state that the injuries were less than one and one-half days old. Consequently, given the lack of evidence indicating police coercion through physical violence, if the medical records had been admitted, the jurors would have

16

speculated as to when, where and how petitioner was beaten and how the alleged beating influenced his statements.

Assuming *arguendo* that the trial judge erroneously excluded petitioner's medical records given the lenient standard under the Federal Rules for determining relevance,[4] the error was harmless. The Second Circuit has yet to decide what harmless error standard applies when a constitutional error is being evaluated for harmlessness for the first time on federal habeas review of a state court conviction. On direct appeal, courts apply the standard set forth in *Chapman v. California*, which provides that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). However, the Supreme Court held in *Brecht v. Abrahamson* that *Chapman* did not apply on collateral review; rather, the standard to be applied is "whether the error 'had a substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.3d.2d 353 (1993). After the enactment of AEDPA in 1996, it was an open question in this circuit whether the applicable test remained the one set forth in *Brecht*, or if the determination should be whether the state court's decision was contrary to, or involved an unreasonable application of *Chapman*. *See Brown v. Keane,* 355 F.3d 82, 91 (2d Cir. 2004). In *Guitierrez v. McGinnis*, the Second Circuit resolved part of the question by holding "that when a state court explicitly conducts harmless error review of a constitutional error, a habeas court must

---

[4]Evidence, to be relevant to an inquiry, need not conclusively prove the ultimate fact in issue, but only have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401; *Doe v. N.Y. City Dep't of Social Servs.,* 649 F.2d 134, 147 (2d Cir. 1981), *cert. denied.,* 464 U.S. 864 (1983) (evidence, while not dispositive of issue, would have incremental effect on probability of finding of consequential fact, and was relevant to that issue).

evaluate whether the state unreasonably applied *Chapman*." 389 F.3d 300, 306 (2d Cir. 2004); *see also Zappulla v. New York,* 391 F.3d 462, 467 (2d Cir. 2004).

In the instant case, the Appellate Division did not conduct harmless error review, and thus *Guitierrez* does not resolve what standard to apply. Respondent urges the court to apply the harmless error standard set forth in *Brecht*. However, the court declines to resolve which of the possible harmless error tests applies because it finds that the alleged constitutional error was harmless under both tests. Aside from petitioner's self-serving statement that he was "beaten up by the cops," the records themselves have only slight probative value that the police physically beat petitioner to coerce an inculpatory statement. The records do not include when petitioner suffered the bump on his head; and more importantly, the records do not state that petitioner's injuries occurred before he made his videotaped confession. Therefore, they could have happened before petitioner was taken into custody, en route to the police station, after petitioner left the police station or at central booking. Petitioner also could have either accidentally or intentionally bumped his head while he was in police custody. Thus, in light of the overwhelming evidence of the voluntariness of petitioner's videotaped statement, as discussed above, any error in the exclusion of the medical records from evidence was harmless.

## III. Conclusion

For the reasons set forth above, Hamza Attawwab's petition for a writ of habeas corpus is denied. Petitioner is further denied a certificate of appealability as he fails to make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see* Fed. R. App. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003); *Luciadore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).

SO ORDERED.

DATED: Brooklyn, New York
July 23, 2007

_____/s/_____
DORA L. IRIZARRY
United States District Judge